JARON HARRIS,

        Plaintiff,

   v.

CLEAN HARBORS ENVIRONMENTAL
SERVICES, INC., ADAM
MASTRACCHIO, et al.,

        Defendants.

1:18-cv-1046-NLH-JS

**OPINION**

**APPEARANCES:**

ALLAN E. RICHARDSON
THE VIGILANTE LAW FIRM, P.C.
99 NORTH MAIN STREET
MULLICA HILL, NEW JERSEY 08062

   *On behalf of Plaintiff*

ROBIN KOSHY
STEVEN J. LUCKNER
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10 MADISON AVENUE, SUITE 400
MORRISTOWN, NEW JERSEY 07960

   *On behalf of Defendants*

**HILLMAN**, District Judge

    Plaintiff Jaron Harris filed suit against Defendants Clean Harbors Environmental Services, Inc. ("Clean Harbors"), Adam Mastracchio ("Mastracchio"), and John Does 1-5, alleging violations of the Fair Labor Standards Act ("the FLSA"), 29

U.S.C. § 201 et seq., and the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. § 34:19-1 et seq. (<u>See</u> Docket Item 1.)

Defendants subsequently moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Docket Item 16.) Plaintiff filed a Response in Opposition. (Docket Item 18.) Defendants filed a timely Reply. (Docket Item 19.) For the reasons expressed below, Defendants' Motion will be granted in full.

<b><u>BACKGROUND</u></b>[1]

### A. The Parties

Clean Harbors is a provider of environmental, energy, and industrial services that provides, among other things, 24-hour emergency response services — such as cleaning spills, leaks, or biohazard disasters — to its clients. Adam Mastracchio is the Field Services Branch Manager for Clean Harbors' Bridgeport, New

---

[1] The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits, and recounts them in the manner most favorable to the party opposing summary judgment — here, Plaintiff. The Court disregards, as it must, those portions of the parties' statements of material facts that lack citation to relevant record evidence (unless admitted by the opponent), contain improper legal argument or conclusions, or recite factual irrelevancies. <u>See</u> <u>generally</u> L. Civ. R. 56.1(a); <u>see</u> <u>also</u> <u>Kemly v. Werner Co.</u>, 151 F. Supp. 3d. 496, 499 n.2 (D.N.J. 2015) (disregarding portions of the parties' statements of material facts on these grounds); <u>Jones v. Sanko Steamship Co., Ltd.</u>, 148 F. Supp. 3d 374, 379 n.9 (D.N.J. 2015) (same).

Jersey facility.  He is responsible for all aspects of that facility's field services division.[2]  Plaintiff was hired by Clean Harbors as a Driver Class B Dry effective May 4, 2015.  He was fired on August 10, 2017.

## B.    The On-Call Policy

Plaintiff's first count contends that Clean Harbors' on-call policy ("the policy"), which requires drivers to be on-call on a rotating basis to respond to emergency response ("ER") services after hours and on weekends, violates the FLSA.  Clean Harbors' Bridgeport facility divides its drivers into two teams that rotated being on-call each week.  Each team had approximately 2-3 drivers during the relevant time period.  The on-call shift begins at 5:00 PM on Friday and ends at 5:00 PM the following Friday.  A driver who is on-call must report to his regularly scheduled assignments each day, but may also be called back to work after hours if an ER situation arises.  If such a situation arises, the on-call coordinator is responsible for assigning the job to one of the on-call drivers.  The coordinator considers whether the driver is eligible to drive

---

[2] "John Does 1-5 are individuals or corporate entities whose identities are not known and who participated in and/or ratified and/or acquiesced to the wrongs committed against Plaintiff by named [D]efendants."  (Docket Item 1 ¶ 4.)  The parties' filings do not further clarify who John Does 1-5 are or what roles they played in this case.  In any event, the Court's ruling will apply to John Does 1-5 equally as it applies to the named parties.

more hours under Department of Transportation ("DOT")
regulations, whether the driver is trained for the equipment
needed, and the driver's work schedule.

Crucial to this litigation is that Clean Harbors does not
pay drivers for the time they are on-call but not working.
Instead, Clean Harbors only pays drivers if they are responding
to an on-call assignment. Clean Harbors — which provides a
company-issued cell phone to all drivers for on-call purposes —
pays the driver from the time he picks up the on-call phone call
and accepts the job through the completion of the job. Upon
being given an on-call assignment, the driver reports to the
Bridgeport facility and travels to the assignment from there.
Defendants insinuate that drivers are permitted to get into
their uniforms after they arrive at the facility. Conversely,
Plaintiff alleges that he was expected to be in uniform upon his
arrival at the Bridgeport facility. Moreover, Defendants claim
that drivers are paid for four hours of time if an on-call
assignment is cancelled after a driver accepts it and travels to
the Bridgeport facility. Plaintiff disputes that assertion,
claiming that drivers do not get paid at all if an on-call
assignment is subsequently cancelled.

Defendants assert that the policy requires employees to
record all time worked while on call, including responding to
any telephone calls, travel time to and from the location, and

any work performed.  Plaintiff points out that the employer is required to maintain accurate records of hours worked per 29 C.F.R. 516.

An on-call driver is not required to remain at Clean Harbors' facility, but instead is free to return home.  Drivers may also leave their homes during their on-call shifts. However, the policy requires the drivers to answer or return on-call phone calls within 15 minutes.  Moreover, the policy requires the drivers to report to the Bridgeport facility within an hour of speaking with the on-call supervisor.  Defendants assert, though, that the on-call coordinator would routinely grant extra time to return to the facility in the event that a driver requested it.  Plaintiff notes that the policy contains no provision to that effect.

The policy permits drivers to switch on-call shifts by finding a replacement driver and submitting an on-call replacement form.  Mastracchio has to approve such replacements, which he has done every single time he has received such a request.  Drivers could find a replacement for any reason, including in order to use vacation days.  Plaintiff argues, however, that the process is not that simple because there are at most three drivers on a team, and whether each driver can pick up another's assignment depends on the replacement driver's DOT limitations as well as what kind of license he has.  In

other words, while the policy does allow drivers to trade shifts with one another, doing so was often impractical due to the above restrictions.  Conversely, Defendants assert that it is rare that a driver cannot find a replacement, but that if that does happen, the driver can let Mastracchio know that he cannot work and Mastracchio will find a replacement driver, perhaps from another Clean Harbors' facility.  Plaintiff denies that this ever happened while he worked for Clean Harbors, though the parties agree that Plaintiff never attempted to switch any of his on-call shifts.

Defendants also assert that if a driver is not available for certain hours of an on-call shift due to obligations such as doctors' appointments, weddings, and birthday parties, then the driver can inform Mastracchio, who will not call the driver during those hours.  Plaintiff denies this as well, pointing to a July 6, 2017 instance in which Mastracchio denied Plaintiff's request to be taken off the on-call list so that he could take his son in for an emergency tonsillectomy.  Moreover, while the parties agree that Plaintiff never asked for additional time to respond to an on-call assignment, Plaintiff notes that (1) there is nothing to suggest that such a request would be granted and (2) Plaintiff did ask Clean Harbors several times to call another driver, which it refused to do.

During Plaintiff's employment, Clean Harbors' Bridgeport facility only received two after-hour ER requests per month. Plaintiff was only called to work an on-call shift about once per month, though the number of calls that he received during each of his on-call weeks varied. Some weeks he received no calls; some weeks he received one call; some weeks he received more calls — up to 10 in a week according to Plaintiff. Plaintiff did not keep track of how many calls he received, nor of how many assignments he actually performed while on-call. According to Clean Harbors' records, Plaintiff only worked 12 on-call assignments during his 16-month tenure with Clean Harbors: two in July 2015, one in August 2015, one in September 2015, one in November 2015, one in May 2016, two in September 2016, one in December 2016, one in March 2017, one in May 2017, one in June 2017, and zero in the other months between June 2015 and August 2017.[3]

Under the policy, drivers are free to engage in personal activities. Nobody ever indicated to Plaintiff that he could not do any certain activities while he was on call, so long as

---

[3] Plaintiff disputes this figure on the grounds that he received as many as 10 calls in a particular week during his tenure. That is comparing apples and oranges. Plaintiff asserts that he received numerous on-call calls during his tenure; Defendants assert that he worked 12 on-call assignments during his tenure. Neither party disputes the other's above assertion, but rather each makes an assertion about a different issue.

the activities did not put Plaintiff in a condition that
rendered him incapable of safely performing the essential
functions of the job (that is, he could not be impaired by
alcohol or drugs).  Additionally, the policy limits drivers'
freedom insofar as they must be able to return to the Bridgeport
facility within an hour of receiving the on-call phone call.

During his on-call shifts, Plaintiff engaged in such
personal activities as playing video games, going to the gym,
playing sports in his backyard, doing home improvement projects,
playing with his children, watching movies and TV, socializing
with friends and family in his own home, sleeping, reading, and
doing house chores.  Plaintiff could have also visited friends,
gone to the mall, or gone to the movies, as long as doing so
would not have prevented him from getting back to the Bridgeport
facility within an hour of receiving the call.  In fact, on two
of the occasions in which Plaintiff received an on-call
assignment, he was at a baseball game and a Six Flags amusement
part, respectively.  Unfortunately for Plaintiff, he lived about
40 minutes away from the Bridgeport facility, which limited his
flexibility when on-call — though he testified that if he had
lived closer to the facility, he could have engaged in other
activities.

**C.   Plaintiff's Performance and Disciplinary History**

Plaintiff's remaining counts contend that Defendants retaliated against him by firing him, in violation of both CEPA and the FLSA. The Court will first discuss Plaintiff's employment with Clean Harbors, including his disciplinary history, before turning to the alleged complaint that he made, which he believes is the real reason for his termination.

Plaintiff, who has a commercial driver's license ("CDL"), applied for a job with Clean Harbors around March 2015. Mastracchio interviewed Plaintiff around May 2015. Clean Harbors hired Plaintiff as a Driver Class B Dry effective May 4, 2015. In that position, Plaintiff was responsible for operating Class B equipment such as vacuum trucks, roll-off trucks, dump trucks, and rack trucks. He reported to Mastracchio. After completing Clean Harbors' training and onboarding process, Plaintiff began driving in June 2015.

Plaintiff succeeded in the technical aspects of his job, but he routinely failed to timely and correctly submit required paperwork. He also failed to respond to two on-call assignments, in violation of Clean Harbors' on-call policy.[4] These deficiencies were noted early in Plaintiff's employment.

---

[4] Plaintiff argues that he missed one such assignment just after he was hired because he did not have a password for the on-call cell phone that Clean Harbors provided to him. However, he does not dispute that he violated the policy twice during his employment.

In August 2015, Mastracchio issued Plaintiff a performance review. In the categories of "Communication" and "Customer Satisfaction," Mastracchio commented, "Jaron has to make sure all of his paperwork is turned in on time and correct." For the category of "Attendance," Mastracchio commented, "Jaron has a good attendance but has to make sure he answers his phone when on call." Under the "Initiative" category, Mastracchio commented, "Jaron has to get out the door quicker in the morning." Plaintiff admits that he sometimes fell behind on his paperwork during his employment.

On March 1, 2016, Mastracchio issued Plaintiff a written warning for failing to timely and correctly turn in his drivers' logs, trip and dispatch reports, and time cards. The warning read:

> Jaron is not following our policies I have talked to
> Jaron about this many times and he is still not
> getting it. This needs to stop today and Jaron needs
> to turn in his paperwork everyday moving forward. If
> this continues Jaron will be suspended and can be
> terminated. Jaron has been talked to many times and
> still is not doing his paperwork correctly and is not
> doing his drivers paperwork or turning it in.[5]

The written warning also stated that if Plaintiff did not improve his performance, he may be subject to further

---

[5] The Court will quote directly from the parties' evidence throughout this Opinion. Any errors in those quotations exist in the original documents and, aside from this footnote, will not be individually pointed out or corrected by the Court.

disciplinary action, up to and including termination.  This
aligns with Clean Harbors' employee handbook, which contemplates
written warnings for an employee's first two offenses,
suspension without pay for the third offense, and termination of
driving privileges and possible employment altogether for the
fourth offense.  Plaintiff does not dispute that Mastracchio and
other employees told Plaintiff that he needed to turn in his
paperwork on time, and that Plaintiff's paperwork was not up to
date.

On August 22, 2016, Plaintiff received his second written
warning — this one for being late to work.  According to that
warning, on August 19, 2016, Plaintiff was scheduled to start
his shift at 4:00 AM.  The client complained that Plaintiff was
not on site, at which point Clean Harbors pulled Plaintiff's
truck's GPS information, which showed that Plaintiff did not
even leave the Bridgeport facility until 5:10 AM.  He did this
without notifying his managers that he was going to be late.
The warning also noted that Jaron was falsifying hours by
clocking in at 4:00 AM.[6]  As with the first warning, Plaintiff
was warned that if he did not improve his performance, he would

---

[6] This allegation is the only part of this warning that Plaintiff
takes issue with.  He contends that his time entry accurately
noted his start time.

be subject to further disciplinary action, up to and including termination.

That same day, Plaintiff received his third written warning, this time for failure to comply with DOT regulations. Per the warning, on August 19, 2016, Plaintiff started his shift around 5:00 AM and, thus, according to DOT regulations, Plaintiff was prohibited from driving past 7:00 PM. However, after 7:00 PM, instead of laying over in Clean Harbors' Bristol, Connecticut facility, Plaintiff continued driving back to Clean Harbors' Bridgeport, New Jersey facility. Plaintiff does not contest that this is what the warning says, but he does deny the substance of the warning. He asserts that he correctly calculated whether he could drive past 7:00 PM on that day and that he was not in violation of DOT regulations by doing so. In any event, Plaintiff was again warned that if he did not improve his performance, he might be subject to further disciplinary action, up to and including termination.

Shortly after receiving these two warnings, Plaintiff received his 2016 performance review, which Mastracchio completed. In the "Communication" category, Mastracchio commented, "Jaron has been written up for his paperwork and needs to correct it ASAP." In the "Customer Satisfaction" category, Mastracchio commented, "Jaron does a good job with our customers but is failing with our internal customers (FSS). My

specialists come to me all the time with issues with Jaron's paperwork." In the "Job Skills" category, Mastracchio commented, "Jaron is a very good B driver but again his paperwork needs to be complete and accurate." Plaintiff received an overall score of "Meets Expectations" on his 2016 performance review.

On January 17, 2017, Plaintiff received his fourth written warning, this time for failing to turn in his drivers' logs and mileage reports on time and correctly. That warning included the following language: "This is Jaron's final warning and has 5 days from 1/30/17 to complete all missing paperwork and mileage. If this is not corrected in five days, Jaron will lose his driving privileges and possible employment with Clean Harbors." This being his fourth warning, Plaintiff was suspended for three days. Plaintiff admitted in his deposition that he was, in fact, behind on his paperwork at the time of this warning and suspension.

Plaintiff served his suspension, completed his missing paperwork, and was permitted to return to work. In addition to the above language, the written warning again stated that if Plaintiff did not immediately improve his performance, he might be subject to further disciplinary action, up to and including termination. Moreover, this warning outlined Clean Harbors' progressive discipline policy, which states that a third offense

would result in suspension and a fourth offense could result in termination. Mastracchio testified that he also warned Plaintiff that any subsequent policy violation would result in termination of his employment. Plaintiff, in his Declaration, stated that he was not specifically told that, though he does not dispute the contents of the fourth written warning.

Finally, on or around August 5, 2017, Plaintiff received a fifth warning. On that day, Plaintiff was on-call and received but did not answer a phone call from the on-call coordinator around 5:30 AM. Mastracchio texted Plaintiff at 6:00 AM, asking Plaintiff to call him as soon as possible. Plaintiff responded at 7:30 AM, writing, "Sry just woke up what's going on?" The warning stated that Plaintiff's failure to respond required Clean Harbors to hire two outside vendors to complete the assignment, which the customer would not pay for.

Plaintiff admits that he overslept and missed the call, but asserted in his Declaration that the job at issue required more equipment than Clean Harbors had available, so the outside vendors would have been required even if he had not overslept. Moreover, Plaintiff stated that, even in spite of his oversleeping, he still could have arrived on the site before the outside vendors. Regardless, the warning stated, "Jaron has 4 other warnings since 3/1/16 and this will be his fifth warning

and this leaves us no choice but to terminate Jaron due to him not following our policies and procedures."

It further stated, "Jaron has not followed our policies and procedures and is being terminated for his lack of not following our P&P." Mastracchio texted Plaintiff on August 6, 2017, stating, "[Y]ou have a meeting on Thursday[, August 10, 2017,] at 0900 in my office until then you are under suspension, For not calling back for a ER yesterday until an 1.5 hr later." Plaintiff was then terminated on August 10, 2017. The parties agree that it was the violation of the on-call policy, outlined below, that prompted Plaintiff's termination.[7]

---

[7] The Court notes that Plaintiff denies paragraph 29 of Defendants' Statement of Undisputed Material Facts. (Docket Item 18-2, ¶ 29.) That paragraph states, in full:

> The decision to terminate Plaintiff's employment was based on Plaintiff being issued five written warnings within the span of just 16 months. Indeed, Plaintiff's final warning stated:
>> Jaron has 4 other warnings since 3/1/16 and this will be his fifth warning and this leaves us no choice but to terminate Jaron due to him not following our policies and procedures. Jaron has not followed our policies and procedures and is being terminated for his lack of not following our [policies and procedures].

(Id. (citations omitted).) Plaintiff's response to that paragraph is: "Denied. Plaintiff's Exhibit 3 makes clear that it was the violation of the on-call policy that prompted the termination." (Id.) Exhibit 3 includes a series of four text messages between Plaintiff and Mastracchio on August 6, 2017. In those texts, Mastracchio notified Plaintiff that he was "under suspension, For not calling back for an ER yesterday

### D.    Plaintiff's Alleged Complaint About the On-Call Policy

Plaintiff alleges that in July 2017 he made a complaint to Robert Casmer, a scheduling coordinator at Clean Harbors, about how restrictive the on-call policy was.  In making this complaint, Plaintiff was trying to see if Clean Harbors would provide him with any monetary compensation while being on-call. Moreover, after Plaintiff made his complaint, another coordinator named Daniel Diehl had an altercation with Plaintiff relating to dropping his children off at day care.  Plaintiff alleges that following the complaint, he told Diehl that he needed to drop off his children at day care during an on-call shift and, though Diehl initially agreed to let Plaintiff leave

---

until an 1.5 hr later."  Plaintiff responded, in two texts, "so I call back and I get suspended others have not even called back at all and they were back to work Monday it don't seem fair . . . I need human resources number.  In the last few weeks people have made no contact when called for an er . . . but because it me I'm getting suspended?  I'm tired of inconsistency when it comes to me."  Mastracchio responded, "I'm not going to talk about other employees J you are on final warning they are not. I will get you human resources number they will be involved in our discussion and your past write ups." (Docket Item 18-6, Exhibit 3 (emphasis added).)

Based on the above, Plaintiff's denial of paragraph 29 highlights a distinction without a difference.  Plaintiff's fifth written warning was the result of his violation of the on-call policy.  That is a violation of Clean Harbors' policies and procedures — again, Plaintiff's fifth — and it resulted in his termination.  Therefore, the purported dispute between the parties on this issue is, in fact, not a dispute: the parties agree that the violation of the on-call policy led to Plaintiff's fifth written warning, which led to his termination.

his on-call assignment early, he then tried to prevent Plaintiff
from leaving the worksite to drop off his children.  Diehl
allegedly told Plaintiff that he could be fired for leaving his
on-call assignment early.  Plaintiff then complained to
Mastracchio that Diehl was trying to get him fired — though
Plaintiff testified that he does not know whether Diehl knew
about Plaintiff's complaint to Casmer.  The next time Diehl was
the on-call coordinator was when Plaintiff overslept, missed an
on-call call, received his fifth warning, and was subsequently
terminated.

Defendants assert that Mastracchio, who made the decision
to terminate Plaintiff's employment, had no knowledge of the
alleged complaint that Plaintiff made to Casmer, nor of any
complaint made by Plaintiff at all during his employment,
whether about the on-call policy or any other issue.  Plaintiff
conceded in his Deposition that he was unaware if Casmer relayed
the complaint to Mastracchio.  Mastracchio, in his
Certification, stated that Casmer was not consulted and played
no role in the decision to terminate Plaintiff's employment.

Plaintiff alleges, however, that the contention that
Mastracchio did not know about his complaints about the on-call
policy is false.  Plaintiff states that "[t]here was regular
grumbling among the workers about the on-call policy.  It came
up during nearly every group meeting and resulted in a meeting

devoted to the issue on August 16, 2016." (Docket Item 18-3, ¶ 13.)

## PROCEDURAL HISTORY

Plaintiff filed his three-count Complaint in this Court on January 25, 2018. (Docket Item 1.) The first count alleges that Clean Harbors' on-call policy violated the FLSA because Clean Harbors did not pay Plaintiff for the time during which Plaintiff was on-call but not working. (Id. ¶ 37.) The second count alleges that Defendants' decision to terminate Plaintiff's employment was retaliatory in nature, also in violation of the FLSA. (Id. ¶ 39.) The third count alleges that, by terminating Plaintiff's employment after he performed a whistleblowing activity as defined under New Jersey's Conscientious Employee Protection Act ("CEPA"), Defendants violated the anti-retaliation provisions of that Act.[8] (Id. ¶ 44.) Defendants

---

[8] In his Opposition Brief, Plaintiff seeks to voluntarily dismiss his CEPA retaliation claim "since it is based on the same facts as the FLSA retaliation claim." Defendants did not oppose this voluntary dismissal. Plaintiff cited N.J.S.A. § 34:19-8 in doing so, which reads:

> Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.

18

filed an Answer on April 4, 2018.  (Docket Item 6.)  After
engaging in discovery for approximately 10 months, Defendants
filed the present Motion for Summary Judgment on March 22, 2019.
(Docket Item 16.)  Plaintiff filed an Opposition Brief on April
16, 2019.  (Docket Item 18.)  Defendants filed a Reply on April
29, 2019.  (Docket Item 19.)

## **JURISDICTION**

The Court exercises subject-matter jurisdiction over this
action pursuant to 28 U.S.C. § 1331 because the claim arises
under the laws of the United States.  Specifically, Plaintiff
alleges violations of the Fair Labor Standards Act, 29 U.S.C. §
201 et seq.  Furthermore, the Court has supplemental
jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state

---

N.J. STAT. ANN. § 34:19-8 (2019).

That section does not require Plaintiff to voluntarily
dismiss his CEPA claim.  Moreover, because Defendants have
already served an Answer and a Motion for Summary Judgment,
Plaintiff may only voluntarily dismiss the claim by filing "a
stipulation of dismissal signed by all parties who have
appeared."  FED. R. CIV. P. 41(a)(1)(A).  Nor will the Court treat
Plaintiff's attempt to voluntarily dismiss the claim "proper" —
which would allow the Court to issue an order dismissing the
claim — because, as noted above, it is unclear to the Court why
Plaintiff feels obligated to dismiss this claim.

Because Defendants rely on the same arguments for both the
CEPA and the FLSA retaliation claims, and because Plaintiff
fully briefed the FLSA retaliation claim, the Court does not
require Plaintiff to submit supplemental briefing on the CEPA
claim.  The Court will grant summary judgment as to the CEPA
retaliation claim based on the same rationale explained below
with respect to the FLSA retaliation claim.

law claim because it arises out of the same circumstances and is based on a common nucleus of operative fact.

## **STANDARD OF REVIEW**

Summary judgment will be granted if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,' . . . demonstrate the absence of a genuine issue of material fact" and the party seeking summary judgment is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citing FED. R. CIV. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marion v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004).

The moving party first bears the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears

the initial responsibility of informing the district court of
the basis for its motion, and identifying those portions of 'the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,' which
it believes demonstrate the absence of a genuine issue of
material fact.").  The moving party may discharge that burden by
"'pointing out to the district court[ ]that there is an absence
of evidence to support the nonmoving party's case' when the
nonmoving party bears the ultimate burden of proof."  Singletary
v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001)
(quoting Celotex, 477 U.S. at 325).

    Once the moving party has met this burden, the nonmoving
party must identify specific facts showing that a genuine issue
for trial exists.  Celotex, 477 U.S. at 324.  The party "may not
rest upon the mere allegations or denials of the . . .
pleading[s]," but instead must rely on affidavits or other
documents.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.
2001).  To withstand summary judgment, the nonmoving party "must
'make a showing sufficient to establish the existence of [every]
element essential to that party's case, and on which that party
will bear the burden of proof at trial.'"  Cooper v. Sniezek,
418 F. App'x 56, 58 (3d Cir. 2011) (quoting Celotex, 477 U.S. at
322).  Therefore, to prevail in opposition of a motion for
summary judgment, the nonmoving party must identify specific

facts and affirmative pieces of evidence that contradict those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 257.

**DISCUSSION**

Plaintiff raises three claims in his Complaint.  The first alleges that he is entitled to unpaid wages under the FLSA for his on-call shifts.  The second and third allege that Defendants retaliated against him in violation of the FLSA and the CEPA, respectively.  Defendants argue that they are entitled to summary judgment on all three counts.  Defendants argue that the unpaid wages claim fails as a matter of law.  They further argue that Plaintiff cannot make out a prima facie case for his retaliation claims or, in the alternative, that Defendants have a legitimate non-retaliatory reason for Plaintiff's termination that is not pretextual.  The Court will address claim each in turn.

**A.    Does Defendants' On-Call Policy Violate the FLSA?**

The Court will first consider Plaintiff's claim that Defendants' on-call policy violates the FLSA.  Specifically, Plaintiff alleges that Defendant's policy of not paying employees for simply being on call but rather only for the time they spend responding to on-call assignments is violative of the FLSA.  In other words, Plaintiff contends that he should have been paid for the time that he spent on-call but not working.

The Court will review Plaintiff's claim under the standard

established by the Third Circuit in <u>Ingram v. County of Bucks</u>,
144 F.3d 265 (3d Cir. 1998). In that case, the Third Circuit
recognized that Department of Labor regulations establish two
circumstances in which on-call waiting time is compensable under
the FLSA. <u>Id.</u> at 268. The first occurs "if the employee is
required to remain on premises" during the on-call time. <u>Id.</u>
The second occurs "if the employee, although not required to
remain on the employer's premises, finds his time on-call away
from the employer's premises is so restricted that it interferes
with personal pursuits." <u>Id.</u>

In this case, the first scenario does not apply because the
parties agree that Plaintiff was not required to remain on
premises. Therefore, the parties dispute whether the second
scenario applies. In the Third Circuit, there is a four-factor
test that is used to make that determination. <u>Id.</u> The factors
are

> first, whether the employee may carry a beeper or
> leave home; second, the frequency of calls and the
> nature of the employer's demands; third, the
> employee's ability to maintain a flexible on-call
> schedule and switch on-call shifts; and fourth,
> whether the employee actually engaged in personal
> activities during on-call time."

<u>Id.</u> The Court will consider each factor in turn.

### 1. First <u>**Ingram**</u> **Factor**

The first <u>Ingram</u> factor asks whether the employee may carry
a beeper or leave home while they are on-call. <u>Id.</u> Here, it is

undisputed that Defendants provided Plaintiff with a company-issued cell phone, which the Court recognizes as equivalent to a beeper for the purposes of this test.  See id. at 268-69 (contrasting employees being required to monitor a hand radio — which "significantly interfered with [employees'] private activities" — with being permitted to either have a beeper or simply leave word of where they would be while on-call — which did not severely restrict employees' freedom).

Moreover, Plaintiff admits that he was permitted to leave home, and even testified that "[n]obody said that [he] couldn't leave [his] house."  (Docket Item 16-4, Exhibit B, at 100:4-19.)  Plaintiff attempts to argue that "while he technically was not tethered to his home, as a practical matter he was house-bound."  (Docket Item 18-1, at 8.)  Plaintiff points to his 40-minute drive to the Bridgeport facility, which he claims severely limited the practicality of him leaving home.  He notes that he once had to cut short a family outing to Six Flags because of an on-call assignment.  Similarly, he once had to leave a baseball game early to respond to an on-call assignment.  He also argues that he could not partake in certain activities like going grocery shopping or fishing because of time constraints.

Each of Plaintiff's arguments that the first Ingram factor cuts in favor of his on-call waiting time being compensable actually support the opposite conclusion.  The first factor is

24

simply about whether Plaintiff was permitted to leave his house,
not whether he actually did.  See Ingram, 144 F.3d at 268
(listing the first factor as "whether the employee may . . .
leave home").  Each of Plaintiff's examples, as well as his own
testimony, illustrates that he was absolutely free to leave his
home while on-call.  Nothing in Clean Harbors' on-call policy
said that Plaintiff could not leave his home.  And, in fact,
Plaintiff did leave his home while on-call.  While he might not
have been able to enjoy that time away from home as much as he
would have liked, there is simply no evidence to support a
finding that leaving home was impermissible under the policy.

Therefore, the first Ingram factor cuts clearly in favor of
a finding that Plaintiff's on-call waiting time was not
compensable under the FLSA.

### 2.    Second **Ingram** Factor

The second Ingram factor looks to whether the frequency and
urgency of calls received while on-call precludes employees from
using their time for personal pursuits.  See Cannon v. Vineland
Hous. Auth., 627 F. Supp. 2d 171, 177 (D.N.J. 2008) ("If an on-
call employee receives calls with such frequency and of such
urgency that the employee 'cannot use the time effectively for
personal pursuits,' then that employee's on-call waiting time is
more likely to be compensable under the FLSA . . . than if the

calls occur less frequently or with less urgency." (citation omitted) (quoting 29 C.F.R. § 553.221(d))).

In considering this factor, the Ingram Court cited a Tenth Circuit case called Renfro v. City of Emporia. Ingram, 144 F.3d at 269. In Renfro, the Court found that the on-call waiting time was compensable since the frequency of calls significantly restricted the employees' personal schedule to the employer's benefit. 948 F.2d 1529, 1537 (10th Cir. 1991). Specifically, the employees — firefighters — were required to report to the stationhouse within twenty minutes of receiving a call, which happened on average three to five times per day. Id. "In contrast, employees who are called to duty less frequently, with a longer response time, can pursue personal activities with minimal interference, and Courts have held that they should not be compensated for on-call time under the FLSA." Ingram, 144 F.3d at 269.

The Ingram Court cited three cases to support that assertion. Id. First was a case in which employees were called back less than once per day and had between thirty minutes and an hour to respond. See Gilligan v. City of Emporia, 986 F.2d 410, 412 (10th Cir. 1993). The second case involved police detectives who were called in on average less than twice weekly and had twenty minutes from when they responded to the page to report to duty. See Armitage v. City of Emporia, 982 F.2d 430,

432 (10th Cir. 1992). The third involved employees who received calls two to five times a week on average and had to report within twenty minutes of receiving the page. See Bright v. Hous. Nw. Med. Ctr., 934 F.3d 671 (5th Cir. 1991). In each of those cases, the on-call waiting time was deemed not compensable.

Similarly, in Ingram the plaintiffs "were not able to demonstrate that the frequency of calls approached three to five calls to duty per day like Renfro." Ingram, 144 F.3d at 269. Moreover, the plaintiffs in Ingram were not required to report to work in a fixed amount of time. Id. Therefore, the Third Circuit found that the second factor weighed against finding that the on-call waiting time was compensable. See id.

In the case at hand, the on-call policy required that employees return an on-call call within 15 minutes and then report to the Bridgeport facility within an hour. There is a factual dispute as to how strictly the hour deadline was enforced, as Defendants assert that extensions were readily granted. There is also a factual dispute as to the frequency with which Plaintiff received calls. Defendants present evidence showing that Plaintiff only worked 12 on-call assignments during his employment with Clean Harbors. Plaintiff does not directly contest that claim, but does assert that he received up to 10 on-call calls per week. This number,

Plaintiff admits, varied widely — in some weeks he would receive
no calls, while in other weeks he would receive the maximum of
10.

The Court is required, at this stage, to believe
Plaintiff's evidence and to make all reasonable inferences in
his favor.  Therefore, the Court will assume for the purposes of
this Motion that Clean Harbors' on-call policy requires, with no
exceptions, employees to arrive at the Bridgeport location
within one hour of receiving the assignment.  The Court will
also assume for the purposes of this Motion that Plaintiff
received up to 10 calls per week that he was on-call.  However,
Plaintiff has not presented evidence to call into question the
reliability of Defendants' records showing that he only worked
12 on-call assignments during his employment.  In fact, he
testified that he has no reason to believe that the records are
incorrect.

Even making the above assumptions, Plaintiff would receive
a maximum of 10 calls per week when he was on-call.  The average
would be lower than that, given that Plaintiff testified that he
would also receive 0 calls per week some weeks.  But even in the
weeks in which Plaintiff received 10 calls, that would only
amount to approximately 1.43 calls per day.  Therefore, even
looking only at the busiest of weeks for Plaintiff, he is not
able to demonstrate that the frequency of calls approached three

to five calls to duty per day like <u>Renfro</u>.  Considering that
Plaintiff admits he did not receive 10 calls every week, the
overall average number of calls he got per day when he was on-
call is even lower than 1.43.

Moreover, Plaintiff had one hour to respond to the calls
when they did result in an actual assignment.  While the <u>Ingram</u>
employees had no time limit, the employees in the other cases
cited by the <u>Ingram</u> Court had much more restrictive limits.
They also received more calls per day on average.  Yet those
courts all held, and the <u>Ingram</u> Court implicitly agreed, that
the frequency and urgency of calls did not preclude the
employees from using their time for personal pursuits.  This
Court finds similarly in the case at hand.  Since Plaintiff
received at most 1.43 calls per week and had an hour to respond
to each, the frequency and urgency of calls did not preclude him
from using his time for personal pursuits.  Therefore, the Court
finds that the second <u>Ingram</u> factor weighs in favor of a finding
that the on-call waiting time is not compensable.

### 3.    Third <u>Ingram</u> Factor

The third <u>Ingram</u> factor looks to the employee's ability to
maintain a flexible on-call schedule and switch on-call shifts.
Again, the <u>Ingram</u> Court considered other cases in which courts
analyzed this factor.  <u>Ingram</u>, 144 F.3d at 269.  For instance,
in <u>Norton v. Worthen Van Service, Inc.</u>, on-call time was not

compensable because employees, who were subject to disciplinary action if they failed to timely respond to a call, could designate themselves as unavailable for certain periods of time. 839 F.2d 653, 654-56 (10th Cir. 1988). This permitted them to "maintain flexibility in their personal time." Ingram, 144 F.3d at 269. Conversely, on-call time was compensable in Renfro since trading shifts was "difficult, if not impossible, to arrange, and the [employees] were subject to discipline if they either failed to answer a call-back or were late." Id. (citing Renfro, 948 F.2d at 1537). Finally, in Ingram itself, the Court noted that "the undisputed facts show[ed] that the [employees] could trade shifts to pursue personal activities without interference." Id. Therefore, the third factor weighed against finding the on-call time to be compensable. See id.

In the case at hand, it is undisputed that failure to respond to a call could result in disciplinary action. It is also undisputed that Clean Harbors' on-call policy permitted employees to trade shifts with one another. However, Plaintiff contends that, much like in Renfro, trading shifts was difficult or even impossible due to several realities. First of all, there were only one or two other drivers on-call at any given time, so it was a small pool to begin with. Second, the drivers could only switch with other drivers who had the same qualifications as them — i.e., Plaintiff could only switch with

another CDL driver.  Finally, DOT time limits had to be considered too.  This, Plaintiff argues, made it impractical for employees to actually be able to switch shifts.  In addition, Plaintiff points to a specific example in which Defendant Mastracchio denied Plaintiff's request to be taken off a shift so that he could take his son to the hospital for an emergency tonsillectomy.

Defendants argue that because they did not interfere with Plaintiff's ability to trade shifts, the waiting time should not be compensable.  However, the cases they cite present distinguishable fact patterns from the case at hand.  For instance, in Cannon, the plaintiffs readily admitted that they never had any trouble finding somebody to take over their shift. That is quite distinct from the picture painted by Plaintiff's evidence here, which suggests that, like in Renfro, it was difficult or nearly impossible as a practical matter for Plaintiff to switch shifts.  Moreover, Plaintiff contends that Mastracchio refused to let Plaintiff call out of a shift on multiple occasions, including when his son required emergency surgery.  Therefore, the third Ingram factor weighs in favor of a finding that the on-call waiting time is compensable.

### 4.    Fourth Ingram Factor

The fourth Ingram factor asks whether the employee actually engaged in personal activities during the on-call time.  The

parties agree that this factor weighs against a finding that the on-call waiting time is compensable. However, given that this is a factor-based test that ought to consider the weight of each factor, the Court will briefly discuss why the fourth factor favors such a finding.

Ingram noted that "the test is not whether the employee has 'substantially the same flexibility or freedom as he would if not on call, [or] else all or almost all on-call time would be working time, a proposition that settled case law and the administrative guidelines clearly reject.'" Ingram, 144 F.3d at 269 (quoting Bright, 934 F.2d at 677). Indeed, "[t]he inquiry . . . is not whether the [plaintiffs] are prevented from participating in certain personal activities, but whether they actually engage in personal activities during on-call shifts." Id. (quoting Berry v. County of Sonoma, 30 F.3d 1174, 1185 (9th Cir. 1994).

Here, Plaintiff rightly agrees with Defendants that he could engage in personal activities while on-call. The only limitations were that he had to be (1) able to respond to the call within one hour and (2) fit for duty (i.e., not impaired) when responding. Plaintiff engaged in numerous personal activities while he was on-call, including playing video games, going to the gym, playing sports in his backyard, doing home improvement projects, playing with his children, watching movies

and TV, socializing with friends and family in his own home, sleeping, reading, and doing house chores. As noted above, Plaintiff could have also visited friends, gone to the mall, or gone to the movies, as long as doing so would not have prevented him from getting back to the Bridgeport facility within an hour of receiving the call. Plaintiff also went to Six Flags and at least one baseball game while he was on-call — and, importantly, he received assignments during those two activities, which he was able to respond to in a timely manner.

In short, the evidence overwhelmingly supports the conclusion that the parties agreed to: Plaintiff actually engaged in numerous personal activities during his time on-call. Therefore, the fourth Ingram factor weighs quite heavily in favor of a finding that the on-call waiting time is not compensable.

### 5. Conclusion

Ingram instructs the Court to consider the above four factors in concert with one another to determine whether they "reveal onerous on-call policies and significant interference with the employee's personal life," in which case the on-call time will be deemed compensable. While the Court does agree with Plaintiff that the third Ingram factor favors a finding that the on-call waiting time is compensable, the overall analysis clearly indicates that Clean Harbors' on-call policy

did not create a significant interference with Plaintiff's personal life. While on-call, Plaintiff was not restricted to either his home or the Bridgeport facility; his calls were quite infrequent and less urgent than the calls in the cases discussed in Ingram; and he was able to participate in countless personal activities. The fact that it was oftentimes impractical — though not uniformly prohibited — for Plaintiff to switch shifts is insufficient to outweigh the rest of the evidence in this case. Therefore, the Court will grant Defendants' Motion for Summary Judgment with respect to Plaintiff's first count because his on-call waiting time is, as a matter of law, not compensable under the FLSA.

### B. Did Defendants Unlawfully Retaliate Against Plaintiff?

Plaintiff also claims that Defendants violated the FLSA and CEPA[9] when they fired him allegedly in retaliation for his complaints about Clean Harbors' above-discussed on-call policy. Under the FLSA, an employer may not "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. §

---

[9] Given the facts of this case, the analyses of both retaliation claims are analogous. Therefore, the Court will refer only to the FLSA throughout this discussion, with footnotes added as needed to explain differences between the FLSA and CEPA. Those differences do not change the analyses or outcomes of the claims.

215(a)(3).[10]   The <u>McDonnell Douglas</u> burden-shifting framework

applies to claims of unlawful retaliation under the FLSA.[11]   <u>See</u>

<u>Cononie v. Allegheny Gen. Hosp.</u>, 29 F. App'x 94, 95 (3d Cir.

2002); <u>see</u> <u>generally</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.

792 (1973).

Under this framework, the plaintiff has the initial burden

of establishing a prima facie case of discrimination under the

relevant statute.   <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>see</u> <u>also</u>

<u>Parikh v. UPS</u>, 491 F. App'x 303, 307 (3d Cir. 2012)

("[P]laintiff must establish a prima facie case of

discrimination.").   This requires the plaintiff to produce

sufficient evidence to allow the factfinder to infer the fact at

issue.   <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S.

248, 254 n.7 (1981).

To establish a prima facie case of retaliation under the

FLSA, the plaintiff must show that: (1) the plaintiff engaged in

a protected employee activity; (2) the plaintiff suffered an

adverse employment action either subsequent to or

---

[10] Under CEPA, "[a]n employer shall not take any retaliatory
action against an employee because the employee . . .
[d]iscloses, or threatens to disclose to a supervisor or to a
public body an activity, policy or practice of the employer . .
. that the employee reasonably believes . . . is in violation of
a law."   N.J. STAT. ANN. § 34:19-2(e).

[11] The <u>McDonnell Douglas</u> framework also applies to CEPA claims.
<u>Winters v. N. Hudson Reg'l Fire & Rescue</u>, 50 A.3d 649, 662 (N.J.
2012).

contemporaneous with the protected activity; and (3) there is a causal connection between the protected activity and the adverse action. <u>Marra v. Phila. Hous. Auth.</u>, 497 F.3d 286, 300 (3d Cir. 2007).[12]

In the case at hand, the parties only contest the causation element of the prima facie cases for the FLSA.[13] For that element, the Third Circuit allows plaintiffs to utilize a "broad array of evidence." <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 284 (3d Cir. 2000). District courts have "focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." <u>McGlone v. Phila. Gas Works</u>, 733 F. App'x 606, 612 (3d Cir. 2018) (quoting <u>Abramson v. William Patterson College of N.J.</u>,

---

[12] Four elements are required for a prima facie case under CEPA: (1) the employee had a reasonable belief that the employer's activity violated a law, regulation, or clear public policy mandate; (2) the employee performed a "whistle-blowing" activity under the act; (3) the employee suffered an adverse employment decision; and (4) a causal connection exists between the activity and the adverse decision. <u>Sarnowski v. Air Brooke Limousine, Inc.</u>, 510 F.3d 398, 404 (3d Cir. 2007); <u>Dzwonar v. McDevitt</u>, 828 A.2d 893, 900 (N.J. 2003).

[13] The same is true for the CEPA claim. Because the analyses are analogous, <u>see</u> <u>Sarnowski</u>, 510 F.3d at 404-05; <u>Lowery v. Koby</u>, Civ. No. 11-5088 (KM), 2016 WL 324948, at *5 (D.N.J. Jan. 26, 2016) ("The requirements for establishing a retaliation claim under either CEPA or the FLSA are analogous, so I analyze them together."), the Court will grant summary judgment in favor of Defendants with respect to the CEPA claim for the same reasons, explained below, that it will grant summary judgment on the FLSA claim.

260 F.3d 265, 288 (3d Cir. 2001)).  "An employee may establish a causal nexus if he shows 'unusually suggestive' temporal proximity between" the protected activity and the adverse action.  Holt v. Pennsylvania, 683 F. App'x 151, 157 (3d Cir. 2017) (citing Leboon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)).

For instance, where a plaintiff is fired just two days after filing an EEOC complaint, causation is established.  See Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989).  If too much time has passed to allow the finding of a causal link between the protected activity and the adverse action, "courts may [also] look to the intervening period for other evidence of retaliatory animus."  Holt, 683 F. App'x at 157 (quoting Farrell, 206 F.3d at 281).  Such evidence can include "a pattern of ongoing antagonism, inconsistencies in the employer's justifications, or any other 'evidence gleaned from the record as a whole' that is sufficient to support an inference of retaliatory animus."  Id. (quoting Farrell, 206 F. 3d at 281).

However, certain other considerations about causation also apply to this factual scenario.  First of all, a decisionmaker must be aware of a plaintiff's engagement in protected activity for a retaliation claim to be cognizable.  See Moore v. City of Phila., 461 F.3d 331, 351 (3d Cir. 2006) ("It is not reasonable for a factfinder to infer that an employer's reaction was

motivated by an intent to retaliate for conduct of which the
employer's decision maker was not aware."). Second of all, the
Supreme Court has held that "[e]mployers need not suspend
previously planned transfers upon discovering that a [protected
activity has occurred], and their proceeding along lines
previously contemplated, though not yet definitively determined,
is no evidence whatever of causality." Clark Cty. Sch. Dist. v.
Breeden, 532 U.S. 268, 272 (2001).

      The Third Circuit has applied that logic to a termination
as well: "the existence of a performance improvement plan
suggests that [the defendant] was 'proceeding along lines
previously contemplated' when it terminated [the plaintiff]."
Gladysiewski v. Allegheny Energy, 398 F. App'x 721, 724 (3d Cir.
2010) (non-precedential). Finally, some courts have found that
"evidence of intervening events tend to undermine any inference
of retaliatory motive and weaken the causal link." See Ruiz v.
Morris Cty. Sheriff's Dep't, Civ. No. 05-1825, 2008 WL 2229851,
at *8 (D.N.J. May 28, 2008) (citation omitted) (citing Gubitosi
v. Kapica, 154 F.3d 30, 33 (2d Cir. 1998)); see also Lenzen v.
Workers Compensation Reinsurance Ass'n, 705 F.3d 816, 821 (8th
Cir. 2013) (holding that the plaintiff's "poor work performance
and insubordination . . . preclude any inference of a causal
connection between the [protected activity] and her
termination"); Horne v. Reznick Fedder & Silverman, 154 F. App'x

361, 364 (4th Cir. 2005) ("[A]ny inference of causation that
might arise out of the temporal proximity is more than rebutted
by the facts that, prior to the protected activity, [the
plaintiff] had been told that her performance was sub-par and
that she should prepare to leave [her job].")

If a plaintiff states a prima facie case — that is,
protected activity, timing, and causation — then the burden
shifts to the defendant to proffer a legitimate, non-retaliatory
reason for the adverse employment action. Daniels v. Sch. Dist.
of Phila., 776 F.3d 181, 193 (3d Cir. 2015). Finally, if the
defendant does that, then the burden shifts back to the
plaintiff to show that the proffered reason is false, and that
the real reason for the action was retaliation. Id.

In the case at hand, Plaintiff argues that he engaged in
protected activity when he complained to one of his supervisors
about the legality of Defendants' on-call policy. Defendants
rightly do not contend in their filings that this activity is
not protected. This clearly constitutes protected activity and
satisfies the first element of the prima facie case. Moreover,
it is undisputed that the made this complaint in July 2017 and
then was fired in August 2017. Thus, the second element of the
prima facie case is also met.

The parties disagree over the third element of the prima
facie case: whether causation exists. Plaintiff argues that

temporal proximity is sufficient to prove causation here.  He
notes that within weeks of making his complaint, Plaintiff was
terminated.  Defendants make several arguments against a finding
that causation is present here.  First, they argue that
Mastracchio, who made the decision to terminate Plaintiff, had
no knowledge of Plaintiff's alleged complaint.  They note that
it is undisputed that Plaintiff made no such complaint to
Mastracchio.  They also note that Casmer — to whom Plaintiff <u>did</u>
make his complaint — had no role whatsoever in the termination
decision.  In short, Defendants argue that Mastracchio could not
have retaliated against something that he did not know existed.

Plaintiff asserts that Mastracchio not being aware of
Plaintiff's complaint is implausible in that it suggests that
management personnel do not speak with one another.  Moreover,
Plaintiff notes that employees were constantly discussing the
on-call compensation policy at work, so much so that Clean
Harbors both issued a May 18, 2015 memo to "reiterate and
affirm" the policy and held an in-person meeting specific to the
policy on August 16, 2016.  Thus, Plaintiff argues, whether
Mastracchio actually knew about the complaint is a genuine issue
of material fact.

Defendants also point out that Plaintiff cannot establish
causation because he was written up four times before making the
alleged complaint.  The fourth written warning specifically

included language to put Plaintiff on notice that his employment would be terminated if he received another warning. Plaintiff then violated Clean Harbors' on-call policy, received a fifth written warning, and subsequently was fired. That all occurred after he made his alleged complaint.

The Court agrees with Defendants. Even considering all of the evidence in the light most favorable to Plaintiff and making all reasonable inferences in his favor, it is clear as a matter of law that Plaintiff fails to satisfy the causation element. Plaintiff presents no evidence whatsoever that Defendant Mastracchio even knew about his alleged complaint. Moreover, Plaintiff had received a fourth written warning, which included a notation advising Plaintiff that a fifth warning could result in his termination, some six months before he made this alleged complaint.

Next, he made his alleged complaint in early July 2017. Only after that did he violate the on-call policy and receive a fifth written warning, which led to his termination. Thus, Plaintiff fails to satisfy the causation element of the prima facie case for various reasons: he presented no evidence that the decisionmaker knew of his complaint; his termination after his fifth written warning was merely "proceeding along lines previously contemplated" by his previous written warnings; and his violation of the on-call policy represents an intervening

event that breaks the causal chain between his protected activity and his termination. Each of those reasons standing alone is sufficient to rule that Plaintiff did not establish the causation element of the prima facie case; together, they make that finding even more obvious. Because Plaintiff does not satisfy the prima facie case for retaliation under the FLSA, the Court will grant summary judgment in favor of Defendants as to that count.

Even assuming arguendo that Plaintiff could state a prima facie case, the Court would still grant summary judgment in favor of Defendants as to the FLSA retaliation count. Defendants' proffered legitimate, non-retaliatory reason for terminating Plaintiff revolves around his disciplinary history at Clean Harbors. Namely, he was only terminated after receiving five written warnings during his relatively brief employment. Plaintiff also received various verbal warnings during that timeframe. Plaintiff violated Clean Harbors' on-call policy only after he was explicitly made aware via his fourth written warning that a fifth such warning could result in his termination. In essence, Defendants' reason for terminating Plaintiff was due to his failure to follow Clean Harbors' policies and procedures.

Plaintiff argues that this reason is pretextual. He does this in spite of the fact that he agrees that he received five

written warnings and that the fourth warning included language notifying him that a subsequent warning could result in his termination. Nor does he contest that he actually violated Clean Harbors' on-call policy in the days before he was terminated. Instead, Plaintiff advances a few arguments as to why Defendants' proffered reason is pretextual. First, he notes that all of his evaluations showed that he was meeting expectations. This is not compelling — as noted repeatedly above, Plaintiff does not dispute that he received five written warnings for violating company policies prior to his termination, the fourth of which explicitly warned him that termination could result upon a fifth violation. His overall evaluations do nothing to contradict that fact.

Next, Plaintiff points out that there was no discipline between January 27, 2017, and his termination. First of all, that is not precisely true: Plaintiff was disciplined by way of being written up and being suspended pending the meeting in which Defendants decided to terminate him. More importantly, it is irrelevant. Plaintiff's fourth written warning did not give any time limit after which the risk of termination for a subsequent violation expired. Instead, it warned that the next violation could result in termination. That the next violation did not come for about 8 months is irrelevant; it did come, and so he was fired.

Finally, Plaintiff makes the illogical argument that, because Clean Harbors' policy states that an employee <u>may</u> be fired for a fourth violation, Plaintiff should have been fired in January 2017, when he received his fourth written warning. Despite the fact that Plaintiff calls this evidence the "[m]ost damning" to Defendants' position, it does nothing to indicate that Defendants' proffered reason is pretextual.  In short, the fact that Defendants gave Plaintiff one last chance to save himself from termination even though their own policies did not require such leniency does not support Plaintiff's position. Defendants gave Plaintiff a fourth and final warning that a subsequent violation could result in termination.  He then violated the policies, so they terminated him.  This only supports Defendants' argument that their proffered legitimate, non-retaliatory reason for terminating Plaintiff is not pretextual.

In sum, Plaintiff offers no evidence sufficient to support a finding that Defendants' proffered legitimate, non-retaliatory reason for terminating his employment was pretextual. Therefore, even if the Court ruled that Plaintiff had made out a prima facie case, it would still grant summary judgment in favor of Defendants because their proffered reason is not pretextual.

**CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's

Motion for Summary Judgment as to all of Plaintiffs' claims.

The accompanying Order will be entered.


Date:_October 23rd, 2019_          s/Noel L. Hillman_____
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.